REEDON OF FARIBAULT, INC., d.b.a.
Best Western Galaxie Motor
Lodge, Respondent,

v.

FIDELITY AND GUARANTY INSUR-
ANCE UNDERWRITERS, INC.,
Petitioner, Appellant,

Palmer and Cornell, Inc., Defendant.

No. C3-85-1503.

Supreme Court of Minnesota.

Jan. 22, 1988.

Chet D. Deter, Michael S. Kreidler, Min-
neapolis, for appellant.

James R. Keating, Faribault, for respon-
dent.

## OPINION

KELLEY, Justice.

Reedon of Faribault, Inc., doing business as Best Western Galaxie Motor Lodge (Reedon), sued its insurer, Fidelity and Guaranty Insurance Underwriters, Inc. (Fidelity) and the insurer's agent, Palmer and Cornell, Inc. (Palmer), claiming breach of contract and negligence following Fidelity's refusal to pay the full loss sustained by Reedon from a fire in the motel. A jury found that Fidelity had not breached its insurance contract. It did find that both Fidelity and Ralph Palmer, acting as Fidelity's agent, were negligent in providing inadequate fire insurance, but concluded that Ralph Palmer in his individual capacity was not negligent. In appealing from a judgment entered on the verdict, Fidelity contends the evidence was insufficient to support a finding of Fidelity's own negligence independent of that of its agent Palmer, and further, that Fidelity was released from liability arising from Palmer's negli-

gence by the *Pierringer* release respondent had given to Palmer. The court of appeals affirmed the judgment of the trial court. We reverse.

The Galaxie Motor Lodge, owned by Reedon, in 1981 consisted of two separate buildings: the front or northern building, which was about 20 years old had 36 units, and the southern building which was about 10 years old had 18 units. Before 1981 respondent had placed insurance coverage on the motel property with the South Carolina Insurance Company. Duane White, the motel manager, in an attempt to acquire less costly insurance coverage on the motel, solicited bids from various agencies representing other insurers. In doing so he sought coverage identical to that provided in the South Carolina Insurance Company's policy, or, as he put it, "apples for apples." The two buildings constituting the motel were then physically separated and under the South Carolina insurance policy were separately insured, named, and identified as Building 1 and Building 2.

Palmer was able to place the insurance on the two buildings with Fidelity in a policy providing the same individual building coverage at a reduced premium. The policy issued by Fidelity did not specifically identify which unit was Building 1 and which was Building 2, but since the coverage on each unit was identical to that on each unit in the South Carolina insurance policy, there was no confusion on the part of anyone as to which building was covered and for what amount—the north, larger, and older building was Building 1 and the other was Building 2.

Shortly after commencement of the policy period, a conference room addition to Building 1 was completed. Reedon insured this addition attached to Building 1 for an additional $100,000 in coverage. The addition actually physically joined the two buildings. When completed the motel property was inspected by one of Fidelity's engineers for the purpose of determining whether it qualified for the rates being charged. White, the motel manager, then knew that the two buildings were separately insured. He was informed that by in-

stallation of a sprinkler system between the extension and Building 2, a less costly premium might be attainable because then the two buildings could continue to be insured separately.

Thereafter, Reedon proceeded to install a sprinkler system and a fire door between the addition and Building 2. Upon completion Fidelity hired Insurance Service Organization (ISO), an independent organization providing services to insurers, to ascertain whether the installations warranted insuring of the two buildings separately at a premium reduction. The independent inspector reported to Fidelity that the fire door which Reedon had installed failed to meet standards permitting continued insurance of the two buildings as separate units; and that unless the installed fire door between the two units was upgraded to a Class A fire door, the motel property would have to be insured as one building at a "considerably higher" rate. Upon being so informed, respondent Reedon proceeded with the necessary installation, but the fire loss occurred before the installation could be completed. The damage caused by the fire was confined to Building 2.

The Fidelity policy provided $586,000 in coverage on Building 1, including the addition, and $324,000 on Building 2, for total coverage on the motel of $910,000. After the fire Fidelity paid $324,000, the full amount of the stated coverage on Building 2, the building destroyed. The parties stipulated Reedon sustained an additional loss of $49,643.

Before trial Reedon settled with Palmer and gave it a *Pierringer* release. Thereafter, though Palmer was retained as a party, it did not participate and the jury was instructed as to the settlement. The jury found Palmer and Fidelity each 45 percent negligent. The trial court ordered Fidelity to pay 90 percent of the verdict by assigning to it the 45 percent culpability the jury had placed on Palmer. The court of appeals affirmed. *Reedon of Faribault, Inc. v. Fidelity and Guar. Ins. Underwriters*, 387 N.W.2d 441 (Minn.App.1986).

On appeal, we address two issues: (1) whether the *Pierringer* release of Fideli-

ty's agent Palmer also released Fidelity from vicarious liability, and (2) whether the evidence is sufficient to support the jury's finding that Fidelity was independently negligent.

1. First, Fidelity argues the *Pierringer* release of its agent Palmer also releases it from this claim of vicarious liability. Reedon argues that Fidelity did not properly plead release as an affirmative defense,[1] and that in any event the *Pierringer* release only released Palmer in its individual capacity and reserved all other claims against Fidelity.

A *Pierringer* agreement allows a plaintiff to release a settling defendant and to discharge a part of the plaintiff's cause of action while reserving the balance of the cause of action against the nonsettling defendants. *Frederickson v. Alton M. Johnson Co.*, 402 N.W.2d 794, 797 (Minn.1987); *Frey v. Snelgrove*, 269 N.W.2d 918, 920 n. 1 (Minn.1978). But does the release in this case also release Palmer's principal, Fidelity, from vicarious liability for negligence of Palmer, its agent?

The release, intended by the parties to be in accordance with *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963), sets out the essential agreement between Reedon and Palmer thus:

> IN CONSIDERATION of the sum of Fifteen Thousand Dollars ($15,000), receipt of which is hereby acknowledged, the undersigned, *Reedon* of Faribault, Inc., d/b/a/ Best Western Galaxie Motor Lodge, *does hereby release and forever discharge Palmer and Cornell, Inc.*, its agents, successors, heirs and assigns, *of and from any claims*, actions, causes of action, *or any claim for loss or damage of any kind or nature whatsoever, which the undersigned now has, or may hereafter have, on account of, or in any way growing out of*, any and all known and unknown, foreseen and unforeseen, property damage and personal injuries and consequences thereof, resulting or to result, or arising from or to arise from, *the fire* which occurred on or about Sep-

tember 25, 1982, at or near the Best Western Galaxie Motor Lodge * * *.

\* \* \* \* \* \*

> The *undersigned does* hereby *credit and satisfy that portion of the total amount of damages* which it has suffered and will suffer because of the aforesaid loss, *which is the responsibility*, if any, *of the party released* hereby as may hereafter be determined to be the case in the further trial or other disposition of this or any other action or claim.

(Emphasis added.)

This agreement evidences the intent of the parties to release all claims. The language quoted above clearly expressed the intent of the parties to release Palmer from "any claim for loss or damage of any kind or nature whatsoever" and from that portion of total damages for which Palmer is responsible. As the dissenting judge of the court of appeals panel noted, there are no words or phrases in the release that limit the effect of it to the liability of the insurance agency in its individual capacity. *Reedon of Faribault, Inc. v. Fidelity and Guar. Ins. Underwriters*, 387 N.W.2d 441, 447 (Minn.App.1986) (Foley, J., dissenting).

Further evidence of the intent to release all claims against Palmer is Reedon's agreement to indemnify Palmer only for judgments obtained against it for contribution since Palmer would have no reason to agree to a release which left it open to a suit by Fidelity for indemnity. A principal is entitled to recover indemnity from its agent for the principal's liability which is due solely to the torts of the agent. *Hendrickson v. Minnesota Power & Light Co.*, 258 Minn. 368, 372, 104 N.W. 2d 843, 848 (1960); *Lunderberg v. Bierman*, 241 Minn. 349, 355, 63 N.W.2d 355, 360 (1954). Since Palmer's liability as an agent and Fidelity's status as a true vicarious indemnitee are not in dispute, Palmer would not benefit from a release which left it open to an indemnity suit. *See* Simonett, *Release of Joint Tortfeasors: Use of the Pierringer Release in Minnesota*, 3 Wm. Mitchell L.Rev. 1, 25 (1977).

---

1. All parties and the jury knew of the settlement. The issue of release, argued by Fidelity in trial brief and post trial motion and decided by the trial court, was litigated by consent.

Reedon argues that it expressly reserved all rights to the balance of the whole cause of action which it might have against Fidelity and that it reserved the right to sue Fidelity for Palmer's torts as an agent. However, the effect of the language of the release is simply to allow Reedon to maintain its action against Fidelity only for Fidelity's own torts.

We hold that the release by *Pierringer* agreement of the insurer's agent in this case released the insurer from vicarious liability. We reverse that portion of the decision of the court of appeals attributing Palmer's 45 percent fault to Fidelity.

2. Next, Fidelity claims there exists no, or insufficient, evidence to support the jury's finding that it was independently negligent.

■ We commence our analysis of this claim by restating and reaffirming the well established rules circumscribing an appellate court's review of jury findings. First, the evidence must be reviewed in the light most favorable to the verdict. *Flom v. Flom,* 291 N.W.2d 914, 916 (Minn.1980). Second, an appellate court will overturn a jury verdict only if no reasonable mind could find as the jury did. *Belden Porter Co. v. Kimball Co.,* 303 Minn. 98, 99, 226 N.W.2d 310, 310 (1975). However, implicit in those rules is the premise that there must exist some evidence to support the verdict, and if there exists no supportive evidence or if the jury's verdict is perverse and palpably contrary to the evidence, an appellate court will, and should, reverse. *See, e.g., Jacobs v. Rosemount Dodge— Winnebago South,* 310 N.W.2d 71, 76 (Minn.1981) (rule stated). *See also Hauenstein v. Loctite Corp.,* 347 N.W.2d 272, 275 (Minn.1984); *Fallin v. Maplewood–North St. Paul Dist. No. 622,* 362 N.W.2d 318, 322 (Minn.1985); *Brulla v. Cassady,* 206 Minn. 398, 289 N.W. 404 (1939). Our examination of the record reveals no evidence to sustain the jury's finding of primary causal negligence on the part of Fidelity. Therefore, the jury's answer to the interrogatory on the verdict finding to the contrary must be reversed.

In the amended complaint, Reedon alleged that Fidelity "was negligent in providing a policy of insurance that was inconsistent with the existing conditions." Thereafter, during the course of this case, the essence of Reedon's claim against Fidelity has been that Fidelity should have insured the motel as one unit or one building, and that had it been so insured, the respondent would have been entitled to recover the unreimbursed fire loss. That being the claim, we then turn to examine those "existing conditions."

It appears clear and without dispute that at the time Fidelity's policy was written the Galaxy motel consisted of two separate buildings; that Fidelity was requested to insure the motel as consisting of two separate buildings, and that Reedon paid a premium on the insurance policy insuring two separate buildings. Thus, at the inception of the policy period, without dispute, Fidelity provided coverage consistent with the then existing conditions.

Further, without any contradictory evidence, the record clearly demonstrates that even after completion of construction of the conference room addition physically connecting the two buildings, additional insurance was requested by Reedon for only the new conference room to which the addition was attached. Additionally, thereafter, the record is replete with uncontradicted evidence that Reedon went to considerable expense and trouble to the end the motel might continue to be insured as two physically separate buildings with a resulting reduced premium cost.

The respondent's assertion advanced in this case surfaced belatedly and for the first time *after* the occurrence of the fire loss. Not only does the evidence show, clearly and without dispute, that before and throughout the policy period respondent had repeatedly ordered separate fire insurance coverage on the two buildings, but it also demonstrated that the respondent *knew* that after the addition had physically connected the two buildings, the motel would have to be insured as one building at a greatly increased premium cost unless a proper sprinkler system was installed in the addition and a Class A fire door erected to separate it from the building which ultimately burned.

From the time Duane White first solicited fire insurance bids on an "apples for apples" basis to the time of the fire, the evidence demonstrates respondent's continuing efforts to reduce premiums by making improvements and alterations so the two buildings could continue to be insured separately. The complete absence of any contrary evidence, or of any facts from which contrary inferences might be drawn, leaves us with the view that there is no support for the jury's verdict that any duty Fidelity might have had was breached causally resulting in damage to the respondent.

Reedon now contends, however, that when Fidelity sent its own employee, and later hired ISO to inspect the motel property it undertook a duty to provide a policy appropriate to the property, that either by underinsuring the destroyed building, or by failing to insure the motel as a unit, respondent claims Fidelity breached that duty.

Fidelity correctly responds that it had no statutory obligation or duty to examine or appraise the Galaxie Motel.[2] The release of Palmer likewise served to release Fidelity from liability for any negligent actions attributable to the agency's action. Therefore, it follows that if the jury's verdict finding Fidelity negligent was based on Palmer's negligence, the verdict could not stand. Thus, because Fidelity owed no statutory duty to examine and appraise, and any failure on the part of Palmer could not be attributed to Fidelity to establish its independent liability, Fidelity could only be liable if it breached a common law duty owed to Reedon.

The court of appeals, with only limited discussion, and without citation to any authority, found such a common law duty to inspect.[3] Though not specifically saying so, the court of appeals apparently relied on Restatement (Second) of Torts § 323 (1965). That section asserts that under the common law one who undertakes to render services to another is subject to liability for harm resulting from the failure to exercise reasonable care to perform the undertaking, if the failure to exercise care increases the risk of harm, or the harm is suffered because of the other's reliance on the undertaking. Assuming, without deciding, that the quoted statement is a correct statement of the law, we must first determine whether Fidelity owed any duty to Reedon.[4] It only owes a duty if it undertook "to render services" to respondent.[5]

The record is devoid of any direct evidence that Fidelity undertook to render to Reedon any service giving rise to a duty. Moreover, evidence which would permit an inference to be drawn that Fidelity independently undertook such a duty is lacking. What the evidence does reveal is that Fidelity did initially what it had been requested to do by respondent's agent White when it submitted a bid, to wit: to provide "apples for apples" coverage to that provided by the then existing South Carolina Insurance Company policy. Later, when the addition attached to Building 1 was completed, Fidelity did what it was requested to do—provide coverage on that addition. While a member of Fidelity's engineering department later inspected the motel property, there can be no contention that his inspection was for any purpose but the sole bene-

---

2. Minn.Stat. § 65A.08, subd. 1 (1978) (repealed 1979), requiring an insurance company to examine and appraise the structures it insures, is no longer the law.

3. The total discussion is found in the sentence "We affirm the jury's finding that once Fidelity undertook to inspect the Galaxy, it assumed a duty to exercise reasonable care in drafting Galaxy's coverage." *Reedon of Faribault, Inc. v. Fidelity and Guar. Ins. Underwriters,* 387 N.W.2d 441, 445 (Minn.App.1986).

4. Whether or not a duty exists raises a legal issue for resolution by courts, not the jury.

*Balder v. Haley,* 399 N.W.2d 77, 81 (Minn.1987); *Germann v. F.L. Smithe Mach. Co.,* 395 N.W.2d 922, 924 (Minn.1986); *Larson v. Larson,* 373 N.W.2d 287, 289 (Minn.1985).

5. This is not a case such as *Johnson v. Urie,* 405 N.W.2d 887 (Minn.1987), wherein we found a duty arising as a result of the relationship between the agent and the insured. Even if it could be argued in this case that the relationship between Palmer and the insured would give rise to such a duty, that would not affect the issue here under consideration because Palmer has been released, thereby releasing Fidelity from its derivative responsibility, if any.

fit of Fidelity to inform it whether the structure justified the rate being charged. The record contains no facts from which any legitimate inference can be drawn that Fidelity then or through him, its agent, undertook to render any services to respondent in connection with advising respondent either on the amount of coverage on each building separately or on the complex as a unit. The sole purpose of his examination was to advise Fidelity whether the motel, as then constructed, was properly rated for insurance purposes. The only recommendations he made to respondent concerned safety matters, such as the installation of fire alarm and sprinkler systems. His advice to respondent had nothing to do with how the complex should be insured nor how the insurance would be apportioned between the building units. Any jury verdict predicated on his inspection report would be "perverse and palpably contrary to the evidence." *See Jacobs v. Rosemount Dodge—Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981).

Even later, after the sprinkler system had been installed, Fidelity hired Insurance Service Organization (ISO), an independent agency furnishing service to the insurance companies with respect to rating risks, to inspect the property and to advise Fidelity if it was properly categorized for the rate being charged. The ISO inspector found (a) that no reduction in the premium rate was justified, and (b) that, in fact, unless a Class A fire door between the addition and the second unit was installed, instead of being insured as two separate units, the building should be insured as one unit in which case the premium cost would greatly increase. The only evidence that either the inspector or Fidelity undertook to render any "service" to respondent was that respondent was informed it would be paying higher insurance premiums unless a Class A fire door was installed so as to permit continuation of insuring the two building units separately. At no time was Fidelity requested by Reedon to appraise or rate the two separate buildings as one for insurance purposes; instead it was asked to provide "apples for apples" coverage. Nor does any evidence exist to establish a duty in Fidelity to write a fire policy insuring the complex as one unit. There simply exists no dispute that insuring the complex as one unit would result in a substantial increase in fire insurance premiums. The evidence is undisputed that was the last thing respondent wanted. It wanted less costly insurance—even to the extent of expending money for a sprinkler system, and for the installation of a Class A fire door so the buildings would continue to be insured separately at a reduced premium.

If Fidelity undertook to render respondent any services, it was only to advise respondent how they could reduce premium costs. Fidelity fulfilled even such a duty by advising that lower insurance premiums could be realized by effectively separating the physically joined buildings by installation of a Class A fire door between them. We conclude that the facts of this case give rise to no liability to Reedon from Fidelity for the uncovered fire loss. Upon receiving a proper proof of loss, Fidelity promptly paid Reedon $324,000 when Building 2 was destroyed. That was the amount of insurance ordered by Reedon; that was the only insurance on Building 2 on which Reedon ever paid Fidelity a premium.

We reverse the court of appeals and remand to the trial court for vacation of the judgment and entry, in lieu thereof, of a judgment in favor of Fidelity.

WAHL and YETKA, JJ., concur in part, dissent in part.

POPOVICH, J., took no part in the consideration or decision of this case.

WAHL, Justice, concurring in part, dissenting in part.

I agree that the release by *Pierringer* agreement of the insurer's agent released the insurer from vicarious liability. I respectfully dissent, however, from that portion of the majority opinion which finds the evidence insufficient to support the jury's finding that Fidelity was independently negligent.

The majority opinion recognizes that the evidence must be viewed in the light most favorable to the verdict. *Flom v. Flom*, 291 N.W.2d 914, 916 (Minn.1980). This court will overturn a jury verdict only if no reasonable mind could find as the jury did.

*Belden Porter Co. v. Kimball Co.*, 303 Minn. 98, 99, 226 N.W.2d 310, 310 (1975). The answer to a special verdict question should be set aside only when it is perverse and palpably contrary to the evidence. *Jacobs v. Rosemount Dodge–Winnebago South*, 310 N.W.2d 71, 76 (Minn.1981).

The jury had before it evidence that the Fidelity policy provided total coverage of $910,000 on the Galaxie motel, that the motel had an insurable value at the time of the fire of $645,000, and that Reedon paid over $7,000 a year for the coverage. The parties agreed that Reedon suffered an uncovered loss of $49,643 when Fidelity refused to pay more than the $324,000 coverage on the section of the motel that burned. There was evidence that though there were notations on the policy making an allocation of coverage on the two sections of the building as it existed at the time of the fire, Reedon wanted coverage and believed it was purchasing coverage for the motel as a whole. Reedon's manager testified that he had not specified how to divide the coverage between the two buildings. The policy did not make clear which building was "Building 1" and which was "Building 2." One of the owners of Reedon testified that the building that burned was the more expensive of the two buildings to reconstruct.

There was also evidence that Fidelity ordered and conducted two separate inspections of the Galaxie, one by a member of its engineering department, one by an ISO inspector. The jury could have inferred that, by inspecting, Fidelity was checking on the premises, not only to ascertain the risk factor and proper premium to be charged but on the correspondence of the terms of the policy to the property as well; that Fidelity undertook to provide a policy appropriate to the property; that one of the buildings was underinsured and the other overinsured or, in the alternative, that the motel was all one building; and that Fidelity breached the obligation it undertook to see that the coverage was appropriate.

Fidelity argues that it had no legal obligation to examine and appraise the Galaxie motel. It is true that Minn.Stat. § 65A.08, subd. 1 (1978) (repealed 1979), requiring an insurance company to examine and appraise the structures it insures, is no longer the law. Nevertheless, under the common law, one who undertakes to render services to another is subject to liability for harm resulting from the failure to exercise reasonable care to perform the undertaking, if the failure to exercise care increases the risk of harm, or the harm is suffered because of the other's reliance on the undertaking. *See* Restatement (Second) of Torts § 323 (1965).

I would hold that the evidence is sufficient to support the finding of the jury that the insurer was independently negligent and affirm on this issue.

YETKA, Justice.

I join in the opinion of Justice Wahl which concurs in part and dissents in part.